# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CRISPIN S. BLANCHETTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:16-cv-02496** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **KINDRED HEALTHCARE** | ) | |
| **OPERATING, INC. and KINDRED** | ) | |
| **HEALTHCARE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This is a breach of contract action that arises from the ending of Crispin Scott Blanchette's ("Blanchette") employment with Kindred Healthcare Operating, Inc. and Kindred HealthCare, Inc.[1] ("Kindred"). Kindred has filed a Motion for Summary Judgment (Doc. No. 44), Blanchette has filed a Response (Doc. No. 47), and Kindred has filed a Reply (Doc. No. 49). The parties have submitted numerous exhibits. (Doc. Nos. 44-2 to 44-16, 46-1 to 46-5, 49-1 to 49-3, 55-1 to 55-4.) Finally, the parties have filed statements of facts, to which responses have been lodged. (Doc. Nos. 44-18, 47, 48, 50.) The motion is ready for decision. For the following reasons, Kindred's motion will be denied.

I.     Facts

Kindred's corporate headquarters offices are in Louisville, Kentucky. Effective February 17, 2014, Kindred hired Blanchette as its Chief Information Officer ("CIO"), reporting to President and Chief Executive Officer ("CEO") Benjamin Breier ("Breier"). (Doc. No. 44-2.) Blanchette

---

[1] Kindred Healthcare, Inc. is the parent company of Kindred Healthcare Operating, Inc.

was to receive a salary of $385,000 per year and to receive a number of other valuable corporate benefits, including stock. (Id.) Kindred's Board of Directors was not involved in the decision to hire Blanchette. (Doc. No. 44-3.)

A.    The Employment Agreement

Kindred and Blanchette executed an Employment Agreement ("Agreement"). (Doc. No. 44-4.) The term of the Agreement was for a one-year period commencing on the Effective Date, February 17, 2014, that was "automatically extended by one additional day for each day beyond the Effective Date that the Executive remains employed by the Company until such time as the Company elects to cease such extension by giving written notice of such election to the Executive." (Id. at 2.) In such event, the Agreement would "terminate upon the first anniversary of the effective date of such election notice." (Id.) The Agreement provides that it "shall be construed in accordance with and governed by the laws of the State of Delaware." (Id. at 11.)

The Agreement provides that Kindred may terminate Blanchette during its term for "Cause."[2] (Id. at 3.) If Kindred terminates the Agreement for Cause, then Kindred owes no obligations to Blanchette. (Id. at 6-8.) However, if Kindred terminates the Agreement for other than Cause, Kindred would owe Blanchette significant salary and benefits. (Id.)

On the other hand, the Agreement provides that Blanchette may resign for "Good Reason."[3] If that occurs, there is a "cure period" before the resignation becomes effective. (Id. at

_____

[2] The Agreement defines "Cause" as: (a) conviction or plea to a crime of moral turpitude; or (b) willful and material breach of duties or responsibilities, committed in bad faith or without reasonable belief that such breaching conduct is in the best interests of the Company or affiliates, but only if the Board adopts a resolution of at least seventy-five percent of its members finding the breaching conduct and Blanchette is given a reasonable opportunity to be heard by the Board and at least thirty days to remedy or correct the purported breach. (Id. at 3-4.)

[3] The Agreement defines "Good Reason" as: (a) a material adverse change in Blanchette's authority, duties, or responsibilities; (b) materially reducing the Base Salary or annual bonus opportunity; (c) requiring Blanchette to relocate his principal business office more than thirty

5.) If Blanchette resigns without Good Reason, the effective date of the termination of the Agreement is the date on which Blanchette notified Kindred of the termination of the Agreement and then Kindred owes no further obligations to Blanchette. (Id. at 5 and 8.) However, if Blanchette resigns with Good Reason, Kindred would owe Blanchette significant salary and benefits. (Id. at 6-8.)

The Agreement specifies that "[a]ny termination by the Company for Cause, or by [Blanchette] for Good Reason, shall be communicated by [a] Notice of Termination given in accordance with this Agreement. For purposes of this Agreement, a "Notice of Termination" means a written notice that (i) indicates the specific termination provision in this Agreement relied upon, (ii) sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated and (iii) specifies the intended termination date (which date, in the case of a termination for Good Reason, shall be not more than thirty days after the giving of such notice). (Id. at 5.) The Agreement does not specify any procedural or substantive requirements for a notice of termination by the Company for other than Cause or by Blanchette without Good Reason. (Id. at 6-8.)

Finally, the Agreement states that "[a]ny dispute or controversy arising under, out of, or in connection with this Agreement shall, at the election and upon written demand of either party, be finally determined and settled by binding arbitration in the City of Louisville, Kentucky" using the Labor Arbitration rules of the American Arbitration Association ("AAA"). (Id. at 9.) Moreover, the Agreement provides that Kindred shall be responsible for all costs of the arbitration and all reasonable fees incurred therein by Blanchette. (Id.).

---

miles from the initial location; or (d) a material breach by Kindred of payment of fringe or pension benefits to Blanchette or Kindred's failure to insist that a successor company assume the employment agreement. (Id. at 4.)

B.    Blanchette's May 2015 Resignation and Subsequent Events

On May 3, 2015, Blanchette sent an email to Breier entitled "Resignation Notice." (Doc.

No. 44-6.) In the email, Blanchette stated:

> "It is with a heavy heart that I send my resignation notice. . . . This is most fundamentally a recognition that time spent with family, and one's physical, social, and emotional health is paramount. Often times the organizational communication around someone's departure equivocates something hollow like 'he has a strong desire to spend more time with family' as code for something else. In this case, the words and the intent are exactly the same. . . . I want to find a way to make this as least impactful on Kindred as possible and give the organization the longest possible runway. At the same time, I would like to not make this an endless transition as both parties will benefit from an efficient timeline. . . . This is all the more difficult acknowledging the profound respect I have for you and the leadership that you bring to such a wonderful organization. That element of the future is what I will miss most following my departure."

(Id. at 1-2.) Blanchette testified in his deposition that, at this point, it was his intention to end his

employment with Kindred:

> Q:    In this e-mail on May 3rd, 2015, it was your intent to end your employment with Kindred Health Care, is that correct?
> A:    Correct.
> Q:    And following this e-mail on May 3rd, 2015, did you at any time specifically revoke or rescind this resignation?
> A:    No.

(Doc. No. (44-5 at 13.) Further, Blanchette testified that he had "no expectation of continued

payment under any agreement for any period after the transition period that [he] would complete

as part of [his] resignation" and "no expectation of continued benefits or stock." (Id. at 145-46.)

Finally, Blanchette testified that, at that time, he did not identify any material breaches of the

Agreement by Kindred, or any Cause under the Agreement. (Id. at 146.) Blanchette and Breier's

testimony agrees that Blanchette would no longer be serving as Kindred's CIO from that point and

would assist with the transition of a new person into the CIO position. (Doc. Nos. 44-7 at 10-11;

52-1 at 9-10.)

However, beyond that, the parties disagree on what happened. Blanchette maintains that Breier "explicitly stated that he was not willing to accept my resignation, and there were going to be other ways to keep me around." (Id. at 140.) Blanchette testified that Breier told him he "was committed to doing whatever he needed to do to keep me there." (Id. at 108.) Breier, on the other hand, testified that he accepted Blanchette's resignation and had no recollection of saying that he would not accept it. (Doc. No. 52-2 at 10-11.) Breier further testified in his deposition as follows:

A: I recall sort of saying, "Okay," you know, "so you're – you're leaving, and I now have to get on with thinking very quickly about what am I going to do to replace the chief information officer of this company. And that is sort of what I remember us talking about.

Q: Okay. Mr. Blanchette testified that when he had this meeting with you after he submitted his resignation that you told him that you considered it a personal failure of yours that he was resigning, that you wouldn't accept his resignation, and that you would find a position for him at Kindred. Did you say words to that effect?

A: I have no recollection of saying that.

Q: Okay. Is it possible you did?

A: No. I don't believe so.

Q: It not possible?

A: That I said a "personal failure on my part"?

Q: Correct.

A: No, not possible.

Q: Okay. Is it possible that you said, "I will not accept your resignation, and we will find you a position at Kindred"?

A: No. That is not possible. In fact, I recall getting on with the work of figuring out who Scott's replacement was going to be.

Q: Okay. Is it possible that you said that, "We will find you a position at Kindred"?

A: We have had some discussions around performance improvement opportunities for the enterprise in total. . . . And Scott had, as I recall, profit [sic] up the idea that there were efficiencies that could be had, that there were, you know, lien management techniques, that there were various things that could be done organizationally to potentially run our operation more efficiently, not as the chief information officer, but more broadly as a – as someone who would help us think about being more efficient, which, you know, we are always in need of doing. And it is – it is possible that that conversation at that conversation, that we had a conversation around saying, "Yeah. That's kind of interesting. You should have a conversation with Kent Wallace, who's our chief operating officer. I'll have a conversation, I guess, potentially with Kent to say you're going to go have a conversation

|     | with him. And why don't the two of you see if there's something here that might be feasible for you to – to do along – you know along that path?" |
| --- | --- |
| Q:  | Okay. I appreciate all that. Is it possible, though, that you said to him, "We will find you a position at Kindred." |
| A:  | I don't believe I said that. |
| Q:  | Okay. |
| A:  | No. |
| Q:  | Is it possible? |
| A:  | Doesn't sound like my words, no. I don't believe so. |
| Q:  | Okay. So it would not be possible that you said that? |
| A:  | You know, anything is possible in the world. I don't believe I said that. |
| Q:  | Okay. But it's possible you did? |
|     | [Objection] |
| Q   | Is it possible that you said to Scott Blanchette, "We will find you a position at Kindred"; yes or no? |
| A:  | I don't believe I said that. |
| Q:  | Yes or no, is it possible that you said it? |
| A:  | I suppose it is possible that I said it. Yes. |

(Id. at 11-13.)

In conjunction with Blanchette's resignation, there had at least been some discussion of a "process and performance improvement office" in which Blanchette might have a future role. (Id. at 11-14; Doc. No. 52-1 at 108.) But, as of early May 2015, there was "no job description for that position . . . no budget, no staff . . . [Blanchette] was supposed to create all that." (Id. at 109.) Blanchette was supposed to discuss the matter with Kent Wallace, Kindred's Chief Operating Officer (who would be the supervisor of such an office) to "work something out." (Id. at 15.) Breier also suggested that Blanchette meet with Steve Cunanan, Kindred's Chief People Officer ("CPO") as well: "And you know, Steve, as the chief people and administrative officer would handle, you know, all kinds of those discussions around contractual relationships and just sort of what would happen in, you know, in some sort of a future offer, and what compensation would look like for [Blanchette]." (Doc. No. 55-2 at 15.)

Kindred never notified Blanchette that the Agreement was terminated, and he continued to be paid under its terms after the meeting with Breier. (Doc. No. 52-4 at 52.) According to CPO

Cunanen, from the viewpoint of Kindred's human resources department, Blanchette went from "CIO" to "outgoing CIO" upon his May resignation. (Doc. No. 52-5 at 33.) This change was from a "practical perspective only" because Blanchette was transitioning out and the new CIO was transitioning in. (Id.)

C.     Events of June and July 2015

Kindred worked to identify a successor CIO and, over the next month, outlined plans for transitioning Blanchette's successor and for ending Blanchette's CIO work. (Doc. Nos. 55-2 at 12-13; 55-3 at 18-19.) In parallel, Wallace and Blanchette met and explored the possibility of Blanchette's new role in the process and performance improvement office. (Id.) Once again, however, the parties' versions of the facts diverge. According to Kindred, Blanchette and Kindred never reached a final agreement, solidified any of the essential terms of such a position for Blanchette, or offered Blanchette an actual new position. After speaking with Wallace, Breier concluded that "it became pretty clear that we weren't going to – they weren't going to come to terms." (Doc. No. 55-2 at 23.) Furthermore, Breier believed that all the parties knew that "if they were not going to come to terms . . . then there was no position at Kindred for Blanchette" and his resignation would actually result in him eventually exiting the organization. (Id. at 23-25.) Blanchette, on the other hand, testified that he and Kindred had absolutely reached an agreement and that Blanchette had accepted the position of head of the process and performance improvement office. (Doc. No. 55-1 at 140-143.)

Moreover, Blanchette testified that he and Kindred had agreed – at Cunanan's request – that his existing CIO Agreement would remain in effect through January 1, 2016 until a new one could be substituted with Board approval. (Id.) Cunanen flat out denies he said this, claiming he could not because "that is under the purview of the Board of Directors." (Doc. No. 52-4 at 53.)

This was in part because, as mentioned, the CIO employment agreement is attached to the position, not the individual, so Cunanen testified that he could never have made a representation to Blanchette that the Agreement would continue in Blanchette's favor out of the Agreement's express bounds (e.g., while Blanchette was performing a new job). (Id. at 51-53.) Breier has testified that "having continued to pay [Blanchette] at his probably current CIO rate and try to help him with the transition, you know, it's – it's in the, you know, no good deed goes undone category, as we sit here today, having really tried to do the right thing for Mr. Blanchette. You know, it's a – we were really trying to be, I think, good stewards and good people to help him in this transition for wherever it was going to go, by keeping his salary in place, et cetera. But he really didn't have a role, honestly." (Doc. No. 52-2 at 17-18.) Accordingly, Cunanen testified that the Agreement remained in place, only "from a pay and benefits perspective," through Blanchette's last day of employment. (Doc. No. 52-4 at 51-52.)

On June 10, 2015, Blanchette sent an e-mail to Cunanen with the subject line "Notice of Resignation." (Doc. No. 44-10.) The e-mail stated only: "With an effective date of August 3, 2015, I resign my position as Chief Information Officer at Kindred Healthcare." (Id.) Cunanen testified that, as CPO, he asked Blanchette to send him this email because he wanted a "succinct" resignation email for Blanchette's employment file that was not the long resignation email containing musings "about his own personal situation" that Blanchette has sent Breier in May. (Doc. No. 52-4 at 35-37.) Cunanen stated that he was "sure" he told Blanchette when to make the resignation effective, although he did not recall when or even any specific direction. (Id. at 34, 38.) Blanchette, however, testified that he sent this email in response to a request from Cunanen and General Counsel Joe Landenwich and that it was for Securities & Exchange Commission purposes. (Doc. No. 55-1 at 153.)

June 16, 2015 is a pivotal date in this dispute. Breier sent an e-mail to hundreds of Kindred employees and affiliates with the subject line "Creation of Process and Performance Improvement Office & Leadership Changes." (Doc. No. 44-11.) After an introduction is a prominent picture of Blanchette, followed by:

> [W]e are creating a permanent Process and Performance Improvement Office in order to continually identify and drive organization process and efficiency throughout the entire Kindred Enterprise. I have asked Scott Blanchette, Kindred's current Chief Information Officer, to lead this initiative. In this new role, Scott's priorities will be to focus on process improvement, quality assurance, compliance and enhanced efficiencies at the enterprise, division, and local levels. As Kindred grows and becomes more complex, it is critical that we ensure all our processes and systems are simple, easy to use, effective and scalable. This new function will enhance our ability to provide quality care. Scott will report to Kent Wallace, Chief Operating Officer.

(Id. at 2.) Below the introduction of Blanchette is the announcement of the promotion of the new CIO, Charlie Waldrip, with the statement that "[w]e know this will be a seamless transition with [Blanchette] acting as Charlie's mentor over the course of the next three months." (Id.) The e-mail concludes by asking the recipients to "[p]lease join me in congratulating Scott and Charlie on their new positions." (Id.) When questioned about this e-mail announcement, Cunanen stated:

> Q:  Now, how is -- how is it that Mr. Breier can send out an announcement like that, but you're telling me Kindred really didn't have a process improvement office until the last six months?
>
> A:  When [Blanchette] submitted his resignation, we were under pressure because he was going to be leaving to go on vacation. And we had a desire to retain [Blanchette] in the organization. And what we said was, we haven't worked out any of the details on this. We haven't reached an agreement with [Blanchette] on what salary or duties would be. We haven't reached an agreement on what budget would be. But in order to ease the transition, from a public perspective, we would go ahead and we would announce this now and we'd work out the details later.
>
> Q:  Okay. So are you saying you announced it publicly even though you weren't sure you were going to go through with this process improvement department?
>
> A:  It was not finalized.
>
> Q:  When that announcement was made, was there a chance that the process improvement office would not exist?

A:    Yes, there was.

(Doc. No. 55-4 at 27-29.) In his deposition, Breier testified:

Q:    Was it true that [Blanchette] had a new position when you sent this e-mail out?
A:    No.
Q:    Why did you say that he did?
A:    You know, in reflection, I wish I wouldn't have sent this note out, but here's what I recall . . . [Blanchette] had resigned his position as the CIO. It was very important to me that we make an announcement regarding the new CIO, Charlie Wardrip. Charlie and I had come to terms. We had agreed that he would transition with the role. [Blanchette] had agreed to transition out of the role. It was important to me that we, A, get that announcement made. The company and the enterprise needed to know who the new chief information officer of our company was going to be. So number one, I wanted to get that out. Number two, I recall that [Blanchette] was concerned about the timing of allowing this to be communicated. He was pushing, as I recall, very hard to be able to want to say something with some form of clarity to the folks that you see on the list, so that, you know, everybody had a sense of the path of where the enterprise was sort of going down.

And as I recall, I remember thinking a lot about this thinking, you know, we haven't come to terms yet with [Blanchette]. I don't know if Kent's going to come to terms with Scott, but I need to announce that Charlie's going to be the new chief information officer of the company. It seemed to me that it was a reasonable risk to take to try and make this announcement, to try and have this transition be as smooth from a public consumption perspective as possible. I was worried about how people would view [Blanchette] for deciding that he wanted to leave. I was worried about the enterprise making sure that it was on stable footing and making sure that they knew we had plan. And so all of this was done sort of in an effort to make sure that the underlings below, you know, the executive committee and Scott and the role there, knew that we had or were working on a plan. Most importantly that Charlie Wardrip was going to transition into and become the new chief information officer. It had always been my view when I sent this out that [Blanchette] and Kent had not yet come to terms on what the role would look like and what would happen. I wasn't sure if they would or wouldn't. I think obviously I sent this hoping that it would work out. Ultimately it didn't and I think in retrospect I regret clearly having sent this announcement out without having had all our ducks in a row.

(Doc. No. 52-2 at 41-42.)

Blanchette spent the last week of June 2015 "off the grid" on a vacation in Africa. (Doc. No. 55-1 at 80-88.) He then spent a week back at Kindred, during which he continued to work on the transition of the new CIO and the creation of the process and performance office. (Id.) Blanchette then took a two-week Caribbean vacation, during which he testified that he performed some similar work remotely.[4] (Id.) Blanchette returned from his travels on July 27, 2015. (Doc. No. 52-4 at 83.)

D.    The End of Blanchette's Employment at Kindred

On August 3, 2015, Wallace sent an e-mail to Cunanen stating: "Hey I am meeting with Scott Blanchette Wednesday in Nashville. I am in Louisville today and tomorrow but felt it was best to try to meet with him outside of Louisville. I am speaking to Ben [Breier] this afternoon to make sure we are on the same page. Will keep you posted." (Doc. No. 46-5 at 12.) Cunanen responded: "Thanks, let me know how I can help." (Id.)

On August, 5, 2015, Blanchette met with Wallace in Kindred's Nashville office. (Doc. No. 55-1 at 157.) According to Blanchette, Wallace "advised [him] that [he] was being let go" because "the company was not serious about changing and was no longer interested in standing up a process and performance improvement office." (Id. at 157-158.) In response, Blanchette admittedly did not raise any questions with Wallace regarding the Agreement. (Id. at 158.)

According to Wallace, the purpose of the August 5 meeting was to tell Blanchette that he "didn't think this was a good idea. That we weren't at terms as far as the job responsibilities. We'd not come to any agreement on salary discussions, the organization, the resources. It just did not feel, like, that it was the right time for the company to do any of this." (Doc. No. 55-3 at 17.)

---

[4] Kindred disputes this, citing to a deposition that they have not introduced into the record. (See Doc. No. 47 at ¶ 51.) This is, obviously, insufficient to create a dispute of material fact on this point. Fed. R. Civ. P. 56.

Wallace testified that he "felt it wasn't right for the organization, [and] it was – it was my responsibility to tell [Blanchette] that." (Id. at 18.) Wallace believed that it was not his "job" to tell Blanchette that his employment at Kindred was over – he "didn't see that as [his] responsibility." (Id.) Wallace further testified that it was fair to say that he assumed that, after this conversation, Blanchette "wasn't going to show up and do any more work for Kindred and wasn't going to take a paycheck." (Id. at 20-21.) In his deposition, Wallace was asked: "Mr. Blanchette says you told him that his position was eliminated and Kindred no longer had a job for him; do you deny that?" (Id. at 21.) Wallace responded: "I do deny that. Yes, sir." (Id.)

Cunanen's understanding of this meeting is that it was based on the fact that "we were not able to reach an agreement – a mutual agreement on what that business transformation role would be." (Doc. No. 52-4 at 45.) Accordingly, Cunanen understood that Blanchette was informed that "Kindred was not going to devote the monetary resources and the personnel as [Blanchette] had designed and envisioned. And we were going to go ahead and his resignation was just going to be effective, and that date was going to come." (Id. at 46.) Cunanen understood this "resignation" to be the one originally accepted in May by Breier. (Id. at 46-49.) This resignation had not had an effective date, but an August resignation date had been supplied by Blanchette in the June 10 e-mail for the personnel file requested by Cunanen. (Id. at 54-55.)

Breier described this development as follows:

Well, there was no termination of employment. We'll start with that. There was a resignation of employment. . . . In an effort, I think, to try and be good corporate citizens, and in an effort to be a good friend, and in an effort to, you know, try and do – you know, to try and see if there was something that could be worked out, we sort of let [Blanchette] hang in to try and work out a new position. And when that couldn't be worked out, I suppose there was a, you know, a second resignation. But it was really – in my view, it was less a – less a resignation of his CIO role, which he had already resigned from, and more a, "This isn't going to work out. You know, now I've got to really exit the organization."

(Doc. No. 52-2 at 24-25.) According to Breier, the main reason behind Blanchette's ultimate departure in August was:

> Well, I think it was mostly not being able to work out Mr. Blanchette's employment terms. You know, when – when [Blanchette] resigned as CIO, that led to a resignation under his employment agreement, you know, which had made him a member of our executive committee, which had him reporting directly to me, which had certain levels of compensation, you know, et cetera. When that ended upon his resignation, there had to be a job created and worked out, and compensation agreed to in an entirely new role. And that never could, seems to me, be worked out. I think there was a secondary component to the resources and the other things that would be needed to run that department. But it seems to me, [the] most salient point of all of that was that, you know, that is – that the terms of his ongoing or future employment couldn't be worked out.

(Id. at 26.)

At 10:49 a.m. on August 5, 2015, Blanchette sent an e-mail to twenty Kindred employees, including the new CIO, with the subject line "Fair Winds and Following Seas." (Doc. No. 44-12.) The first paragraph of the e-mail states: It is with a good deal of disappointment that I inform you that we were unable to reach terms on how best to formalize and advance a permanent Performance and Process Improvement Office. Hence, after tying up some loose ends, I will be leaving Kindred shortly." (Id.) Wallace testified that this was a "very accurate" representation of the meeting he had just had with Blanchette. (Doc. No. 52-3 at 52.)

At 8:33 p.m. on August 5, 2015, after receiving a forward of Blanchette's farewell e-mail, Breier sent an e-mail to Wallace and Cunanen that stated: "Good ending. Well done Kent. Can we now please get Charlie to cut off his email access? And let's get his shit out of the office so Joel can move in. Thanks." (Doc. No. 46-4 at 8.)

On August 18, 2015, Kindred completed a template form in their human resources system entitled a "Personnel Action Request" denoting Blanchette's "resignation with notice" with an

effective date of August 7, 2015. (Doc. No. 44-13.) The delay of entry of this form into Kindred's

system is due to internal filing issues unrelated to this case. (Doc. No. 44-14 at 34-35.)

On October 15, 2015, Cunanen sent Blanchette a letter discussing Blanchette's demand for

payment under the Agreement. (Doc. No. 46-3 at 21.) The letter suggested that Kindred did not

accept Blanchette's resignation in May, but rather did so in August:

> "We agree that on May 3, 2015, you informed us of your intent to resign your
> employment for personal reasons. We began immediately discussing with you a
> transition from your role as CIO, but shortly thereafter, you proposed a new role
> for yourself, working as the leader of a yet-to-be formed performance and process
> improvement group. You provided a timeless that indicated you would lead a
> "hands on" transition for Charlie Wardrip as successor to your role as CIO through
> June; that July would be an observation and mentorship period in Charlie's
> transition, and that July and August would be a ramp up time period for the new
> performance and process improvement office. On June 10, 2015, you sent an email
> to me, stating that you were resigning your position as CIO effective August 3,
> 2015. After discussing the new role with you, we agreed to announce that you
> would be moving into that new role. However, we had not finalized an offer; salary
> had not been finalized, staffing of the new office had not been finalized and your
> role had not been completely defined. In short, we had not prepared an offer letter,
> nor had we gotten to the stage where we had agreed on the terms that would have
> enabled us to make the offer.
>
> . . . During the six-week period that you were out, we reviewed your proposal and
> determined that our resources and expectations were far different than your
> expectations and it became clear that we could not go forward. When you returned,
> we accepted your resignation.

(Id. (emphasis added).) In his deposition over a year later, however, Cunanen testified that this

letter was "not correct" and that Kindred had in fact "already accepted the resignation" in May

2015 and before the August 5 meeting. (Doc. No. 52-4 at 62-64.)

E.     Demand for Arbitration

On June 15, 2016, Blanchette submitted to Kindred a written demand for arbitration. (Doc.

No. 1 at ¶¶ 24-25.) Blanchette asserted that this dispute related to his separation, which he claimed

concerned the Agreement. (Id.) Blanchette further asserted that, under the Agreement, Kindred

had an obligation to arbitrate and pay all costs of arbitration and unrelated fees. (Id.) On June 17,

2016, the AAA assessed Kindred the opening costs of the arbitration. (Doc. No. 1-3.) On July 11,

2016, counsel for Kindred wrote to counsel for Blanchette and stated the following:

> Kindred is not required, and is not willing, to arbitrate any disputes related to the termination of Mr. Blanchette's employment. Both Mr. Blanchette and Kindred agree that he tendered his resignation on May 3, 2015. As a result, after May 3, 2015, Mr. Blanchette continued his employment at Kindred on an at-will basis for no specific duration. His employment was not government by the terms of his prior Employment Agreement, including the arbitration provision, following his tendered resignation. As such, Kindred is not bound by the arbitration provision of Mr. Blanchette's initial Employment Agreement and has no obligation to arbitrate any disputes related to his separation from Kindred.

(Doc. No. 1-5.) Kindred paid nothing to the AAA, and the AAA administratively closed the

nascent arbitration proceeding. (Doc. No. 1-4.)

     F.     <u>Blanchette's Complaint and Procedural History</u>

On September 19, 2016, Blanchette filed this action. (Doc. No. 1.) In the Complaint,

Blanchette claims that (1) he submitted his notice of resignation to Kindred on May 3, 2015, but

it was not accepted and Blanchette continued to work at Kindred – at Kindred's initiative – on

developing a new position as head of a performance and process improvement office; (2)

Blanchette accepted Kindred's offer to head the new office and agreed with Kindred that, through

2015, the terms of the Agreement would remain in effect; (3) Kindred, through the date it

terminated Blanchette, continued to provide him the pay and benefits in the Agreement; (4)

Kindred involuntarily terminated Blanchette's employment other than for cause on August 5, 2015

and took the position that it had not terminated Blanchette, but had accepted the resignation

tendered months earlier; (5) following the termination of Blanchette's employment with Kindred,

Blanchette requested that Kindred pay him and provide him the benefits, including stock, due to

him pursuant to the Agreement, but Kindred refused; and (6) Blanchette demanded arbitration of this dispute because it concerned the Agreement, but Kindred refused. (Id. at ¶¶ 10-30.)

In one cause of action, Blanchette asserts that Kindred breached the Agreement by (1) "refusing to pay the amounts and benefits due to [Blanchette] for Kindred's other than 'for cause' termination of Plaintiff," and (2) "refusing to arbitrate with [Blanchette] whereby it would have been required to pay [Blanchette] for all reasonable attorneys' fees and accountants' fees he incurred in resolving the dispute between the parties." (Id.)

II.    Legal Standard

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). After the movant has satisfied this initial burden, the nonmoving party has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render

summary judgment inappropriate." <u>Hill v. White</u>, 190 F.3d 427, 430 (6th Cir. 1999) (citing <u>Anderson</u>, 477 U.S. at 247-49).

III.     <u>Analysis</u>

A.     <u>Choice of Law</u>

Kindred asserts that, even though the Agreement specifies that it is governed by Delaware law, the Court should apply Kentucky law to Blanchette's breach of contract claim because Delaware has no material connection to the Agreement and the parties entered into the Agreement in Kentucky.[5] (Doc. No. 441- at 15 n.3) Blanchette "disputes that Kentucky law governs this action." (Doc. No. 46 at 10.) But Blanchette concedes that "which state's law governs makes no difference for this motion." (<u>Id</u>.) As illustrated by the discussion focused on the factual disputes below, the Court agrees with Blanchette's latter observation. Regardless, given that Blanchette

---

[5] It is well-established that federal courts sitting in diversity must apply the choice-of-law rules of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>Charash v. Oberlin Coll.</u>, 14 F.3d 291, 296 (6th Cir. 1994). Tennessee follows the rule of *lex loci contractus*, which provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. <u>Ohio Cas. Ins. Co. v. Travelers Indem. Co.</u>, 493 S.W.2d 465, 467 (Tenn. 1973). If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met. <u>Vantage Technology, LLC v. Cross</u>, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999). First, the choice of law provision must be executed in good faith. <u>Goodwin Bros. Leasing, Inc. v. H & B Inc.</u>, 597 S.W.2d 303, 306 (Tenn. 1980). Second, the jurisdiction whose law is chosen must bear a material connection to the transaction. <u>Id</u>. Third, the basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. <u>Id</u>. Finally, the parties' choice of another jurisdiction's law must not be "contrary to 'a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern." <u>Id</u>. at n.2 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971)). If a contractual choice of law provision is missing or invalid under the above analytical rubric, "the substantive law of the state in which the contract was executed governs disputes arising from the contract." <u>In re Estate of Davis</u>, 184 S.W.3d 231, 234 (Tenn. Ct. App. 2004).

apparently does not object to the application of Kentucky law for purposes of this motion, the Court will consider it here to any minimal extent it may be necessary.[6]

B.      Kindred's Substantive Arguments for Summary Judgment

Kindred makes three substantive arguments for summary judgment. The Court will address each in turn.

First, Kindred argues that there is no evidence that it had any contractual obligations to Blanchette on August 5, 2015 and so his claim fails as a matter of law. The underpinning for this argument is the assertions that (1) the Agreement ended on May 3, 2015 when Blanchette resigned without Good Reason and Kindred had no further obligations to him whatsoever, (2) Blanchette became an at-will employee on that date, and (3) that at-will employment ended when Blanchette resigned (again) on August 5, 2015. (See Doc. No. 44-1 at 15-17 (citing Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 792 (Ky. 2004) (noting that either party may end an at-will employment relationship at any time "for good cause, for no cause, or for a cause some might view as morally indefensible").) In addition, inherent in this argument is Kindred's contention that "[t]he fact that Kindred continued to pay Blanchette the same salary and benefits to which he would have been entitled under the Agreement [from May 3, 2015] until August 3, 2015 is irrelevant." (Id. at 16.) In short, Kindred essentially contends that Blanchette resigned on May 3, 2015 and nothing that followed legally matters.

This is a somewhat heroic argument based on the record before the Court. To the contrary, the Court finds that, as demonstrated above, there are crystal clear disputes of material fact relevant to this argument. Just a few of the more obvious disputes in the light most favorable to Blanchette,

_____

[6] The parties have not provided the Court with enough information to make any further determination regarding choice of law.

include (1) whether Blanchette's "resignation" was accepted or rejected by Kindred in May 2015, (2) whether Kindred continued to perform under the Agreement after May 2015 and the parties' understandings of that performance, (3) whether Blanchette was ever offered and accepted the position as head of the process and performance improvement office,[7] (4) whether an agreement was reached between Kindred and Blanchette to keep the Agreement in place through the end of 2015, and (5) depending on whether Blanchette's "resignation" was accepted or rejected in May 2015, whether Blanchette resigned (for either a first or second time) or was terminated by Kindred in August 2015.[8] These existing questions of material fact preclude summary judgment.

These factual disputes are sufficiently established by Blanchette's deposition testimony, Declaration, and documentary evidence. In its Reply brief, Kindred argues vociferously that Blanchette's evidence is "self-serving" and "without factual support" and is thus insufficient to defeat the motion for summary judgment. Kindred relies upon Hadley v. Inmon, No. 3:04-CV-121, 2006 WL 141750, at *8 (E.D. Tenn. Jan. 18, 2006). Hadley, however, is far from analogous. In Hadley, the plaintiffs attempted to create a material issue of fact and challenge the validity of an assignment by including the following two paragraphs in each of their affidavits:

> 14. Contrary to Paragraph 8 of the Affidavit of Billy R. Inmon, I do not recall signing an Assignment of Bid, and the bank where we signed the documents was not a branch we did business with.

> 15. I believe the document entitled Assignment of Bid is a forgery.

---

[7] This factual dispute is notable because it is so blatant. Blanchette claims he was offered and accepted the job. Breier sent a company-wide email introducing Blanchette as the new head of the office and asking for congratulations. But Kindred's witnesses testified that no such position even existed.

[8] Kindred's own versions of events have not been internally consistent either. Cunanen's October 15, 2015 post-claim letter to Blanchette, which asserted that Blanchette merely discussed an "intent" to resign in May and that Kindred "accepted" that resignation in August stated a version of the facts at odds with Kindred's own current explanation. In his deposition, Cunanen later testified that this was "not correct" and that Kindred had in fact "already accepted the resignation" in May 2015 and before the August 5 meeting.

Id. The Court held that these statements alone did not meet the requirements of Rule 56(e) for summary judgment affidavits and did not create an issue of fact concerning the validity of the assignment. Id. This was because Rule 56(e) requires that affidavits supporting or opposing summary judgment must include facts based on personal knowledge, and therefore "statements made 'on information and belief' are insufficient to satisfy the personal knowledge requirement of Rule 56(e)." Id. Moreover, the Court held that the statements that the plaintiffs "d[id] not recall" signing the assignment also did not demonstrate the personal knowledge required under Rule 56(e). Id. In this context, rather, stating "I did sign" or "I did not sign" the assignment would demonstrate facts based on personal knowledge. Id. Here, Blanchette gave a 165-page deposition about his direct, personal knowledge of the events involved in this case. (Doc. No. 52-1.) Blanchette also submitted a two-page Declaration containing statements of personal knowledge. [9] (Doc. No. 46-2.) Further, Blanchette submitted supporting documentary evidence.

Kindred's second argument is an offshoot of its first. Assuming, arguendo, that the Court believes that Kindred has established that Kindred and Blanchette had an at-will employment relationship after May 3, 2015, Kindred argues that the parties never reached an oral agreement to alter that at-will relationship in Blanchette's favor prior to August 5, 2015. (Doc. No. 44-1 at 17-18 (citing Shah v. Am. Synthetic Rubber Corp., 655 S.W.2d 489, 492 (holding that parties can

---

[9] The Declaration is not suspect. Kindred also complains that Blanchette's Declaration is improperly contradictory of his deposition testimony. The Court does not agree. In his deposition, Blanchette explains that there was no formal pre-existing performance improvement office position in the weeks following what he claimed was the rejection of his resignation in early May, but that "[t]he offer had been made by both Kent and Ben to lead this function." (Doc. No. 55-1 at 111-114.) In his Declaration, Blanchette stated that he had accepted the offer to head the office by no later than June 16, 2015. (Doc. No. 46-2.) The Court does not find this evidence to be contradictory without sufficient explanation. Moreover, the jury will be fully capable of considering the relative value of Blanchette's Declaration.

alter an at-will employment relationship only with a clear statement of intention to do so).) Blanchette, of course, disputes this premise because he maintains that his May 2015 "resignation" was rejected. Regardless, Kindred's own brief is self-defeating. The first paragraph of Kindred's argument in this section highlights the material factual dispute between Blanchette, on the one hand – who testified that he was told the Agreement would remain in place through 2015 until 2016 when the Board could come up with a new employment agreement for him in his new position as head of the process and performance improvement office – and Cunanen, on the other hand – who denied that neither he nor Wallace told Blanchette anything of the sort. (Id. at 17.) This is not grounds for summary judgment.

Kindred's final argument is similarly without merit. Kindred argues that, even assuming all of the facts alleged by Blanchette are true, Blanchette resigned without Good Reason on August 5, 2015, thereby terminating the Agreement without additional obligations on the part of Kindred. (Doc. No. 44-1 at 19-20 (citing Metro Louisville/Jefferson Cty. Govt. v. Abma, 326 S.W.3d 1, 8 (Ky. App. 2009) (must have valid contract, breach by the accused, and damages flowing from breach).) However, there is a clear dispute of material fact as to whether Blanchette "resigned" in August 2015 (for the first or second time) or was terminated by Kindred without Cause during the meeting with Wallace. As such, this is also not grounds for summary judgment.

The Court also notes that, although Kindred does not argue this point, it does include a sentence in its conclusion stating that because in its view Blanchette was employed at-will on August 5, 2015, "Kindred had no obligation to arbitrate any disputes related to his separation." (Doc. No. 44-1 at 20.) As the Court has discussed, there are questions of fact regarding Blanchette's employment status on May 3 and August 5. But more importantly, Kindred appears to misapprehend the question of whether it had an obligation to arbitrate: the Agreement specifies

that Kindred had a duty to arbitrate "[a]ny dispute or controversy arising under, out of, or in connection with this Agreement." The relevant question as to arbitration, therefore, is not the status of Blanchette's employment on August 5, but whether the claim asserted by Blanchette arises "in connection with" the Agreement. Given that (1) Cunanen testified that the Agreement remained in effect through the last day of Blanchette's employment, (2) the Complaint is based on the Agreement, and (3) Kindred's own summary judgment motion brief relies extensively on the Agreement or the lack thereof, the assertion of Kindred that Blanchette's claim does not arise "in connection with" the Agreement and that Kindred had no obligation to arbitrate is peculiar indeed. Regardless, to be clear, the Court also does not find any grounds for summary judgment on the aspect of Blanchette's claim that relates to breach of the Agreement's arbitration provision.

IV.    Conclusion

Drawing all inferences in favor of Blanchette, a reasonable jury could conclude that there is sufficient evidence to support his breach of contract claim. Moreover, numerous questions of fact prevail. Accordingly, Defendants' Motion for Summary Judgment (Doc. No. 44) will be **DENIED**. The breach of contract claim will proceed to trial on March 27, 2018. All deadlines in the Court's December 13, 2016 Order (Doc. No. 20) remain in effect.

An appropriate Order will enter.


_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE